### 17606

Reginald WILLIAMS and W. H. Carter, Plaintiffs-Respondents, **v.** E. I. DU PONT DE NEMOURS & COMPANY, Defendant-Appellant

(112 S. E. (2d) 485)

*Messrs. Robinson, McFaddin & Dreher,* of Columbia, *for Appellant,*

*Messrs. Blatt & Fales,* of Barnwell, *for Respondents,*

January 26, 1960.

LEGGE, Justice.

The plaintiff Williams, a citizen of Barnwell County, South Carolina, formerly in the employ of the defendant, E. I. DuPont de Nemours & Company (hereinafter referred to as DuPont), a Delaware corporation, at its Savannah River Plant in Barnwell and Aiken Counties in South Car-

olina, brought this action on August 28, 1958, in the Court of Common Pleas for Barnwell County, seeking to recover damages in the amount of $100,000.00 because of alleged negligent and willful breach by DuPont of its duty to him as its employee in forcing him to work in such manner and under such conditions as to impair his health and cause him to become permanently disabled. He joined with him as plaintiff his aunt's husband, W. H. Carter, a citizen of Delaware, to whom he had assigned, on August 16, 1958, an undivided one-hundredth interest in this cause of action.

The case having been removed to the United States Court for the Eastern District of South Carolina, and by that court remanded to the Court of Common Pleas for Barnwell County, the defendant moved before the presiding judge of that court to strike the name of Carter as plaintiff upon the ground that he was not a real party in interest for the reason that Williams' cause of action, being in tort for alleged injury to his person, was not assignable. From the order refusing that motion the defendant gave timely notice of appeal. It also sought, unsuccessfully, a stay of proceedings pending determination of that appeal.

The complaint alleged, in substance:

That Williams was in the employ of DuPont from August, 1953, until September, 1957, when he resigned.

That in November, 1956, he experienced certain abdominal discomfort which continued until January 10, 1957, when he was admitted to the Barnwell County Hospital suffering with an active duodenal ulcer.

That he remained in said hospital until January 19, 1957, when he was dismissed and allowed to return to his home to follow a strict diet with ample rest.

That on January 28, 1957, at the request of the defendant's Medical Department maintained at the Savannah River Plant for the benefit of the defendant, he was allowed by his physician to return to his work, but only after he and his physician were assured by the defendant's agents in charge of said Medical Department that he would be given

only light work and would be allowed certain time off from work at short intervals during each day in order that he might maintain the strict diet that his physician had prescribed for him.

That a few days after his return to work as aforesaid, he was ordered to resume regular work with no time out to allow him to comply with his strict diet, being then advised by defendant's agents in charge of its Medical Department that such activity would not injure his health; and that, when he protested he was advised that he must either work as ordered by the defendant or be discharged.

That, relying on the assurance by defendant's said agents that his return to regular work and a normal work routine would not be injurious to his health, he continued his regular work for the defendant until the early part of May, 1957, when his abdominal discomfort began again, with the result that he had to remain at home for about one week until May 12, when he was admitted to the Barnwell County Hospital where he remained until May 22, 1957, on which date he returned to his home, his personal physician having prescribed a strict diet and ample rest.

"That prior to his return to his home from the hospital, as set forth above, plaintiff Reginald Williams was advised by the defendant, through its agents, servants and employees, that when he was able to return to his work, that said plaintiff would have to work shift work, with irregular hours. That prior to his return to work on or about the 26th day of June, 1957, the plaintiff, Reginald Williams, once again advised the defendant that such work would be injurious to his health as he could not under those conditions get the necessary rest nor remain on the diet prescribed by his physician, and said plaintiff's physician likewise advised the agents, servants and employees of the defendant in charge of the defendant's Medical Department that such irregular work hours would seriously injure said plaintiff's health."

"That despite these warnings made by and on behalf of the plaintiff Reginald Williams, the defendant through its

agents, servants and employees in charge of its Medical Department again advised said plaintiff that such irregular work would not be injurious to his health, that if said plaintiff wished to continue to work for defendant he must follow that work schedule given him by the defendant, and that said plaintiff would either have to work these irregular hours, known as shift work, or be discharged from his employment with defendant. That plaintiff Reginald Williams, again acting on the assurance by defendant's agents, servants and employees that the irregular work hours would not injure his health, and needing to work in order to support his family as aforesaid, obeyed the defendant's orders and continued to work the irregular hours for approximately one month, when the abdominal trouble started again, necessitating said plaintiff's confinement in the hospital in Columbia, South Carolina, from August 13, 1957, until August 22, 1957, and in the Barnwell County Hospital from August 22, 1957, until August 24, 1957, and shortly after his return to his home, said plaintiff resigned his work at the defendant's Savannah River Plant because of the condition of his health."

"That because of the negligence, willfulness, wantonness and recklessness of the defendant, its agents, servants and employees in forcing the plaintiff, Reginald Williams to work in the manner heretofore described under threat of discharge, against the protests of the said plaintiff and his physician, and in advising said plaintiff that such work would not be injurious to his health, said plaintiff's abdominal ulcer was greatly aggravated and his physical condition worsened until said plaintiff has become permanently disabled."

That said plaintiff, who is twenty-nine years of age, would have fully recovered from his original abdominal condition and would have been in excellent health but for the alleged negligence and willfulness of the defendant.

By its answer the defendant pleaded:

For a first defense: That the complaint fails to state facts sufficient to constitute a cause of action, in that it shows on

its face that the defendant has breached no duty owed by it to its employee for which a claim or cause of action for tort at common law would lie. .

For a second defense: That plaintiffs' sole remedy, if any, is by procedure under the South Carolina Workmen's Compensation Act, Code 1952, § 72-1 *et seq.,* since both the defendant and Williams elected to be bound by the provisions of that act as it affects all claims arising out of the employer-employee relationship at the Savannah River Plant; and that Williams, recognizing the jurisdiction of the South Carolina Industrial Commission, had filed with that body a claim for compensaton based upon the condition or injury which is the subject of this action.

For a third defense: That the purported assignment by Williams to Carter of a portion of the former's claim is invalid under South Carolina Law, and that Carter is not a real party in interest and should be eliminated from the cause. Admission of the allegation that Williams was in the defendant's employ from August, 1953, until his resignation in September 1957. Averment that his return to work on or about January 28, 1957, following his stay in the hospital, was of his own volition; that he was not assigned to heavy work; and that he had ample opportunity to follow any diet prescribed by his physician had he desired to do so. Denial that he was at any time prevented by the defendant or its agents from following any diet recommended to him; and denial of the allegation that he had no opportunity to follow said diet during duty hours. Admission that Williams was again hospitalized in May, 1957. Averment that from January 1, 1957, until his resignation on September 16, 1957, Williams lost a total of 121 days from work. Admission that on his return to work on June 26, 1957, Williams was put on shift work along with other men in the same work category. Averment that his duties consisted of separating and putting clothing on the shelf, and in cleaning small tools such as pliers and screwdrivers. Admission, upon information and belief, that he was again hospitalized for some

period in August, 1957. Denial of the allegations charging it with negligence and willfulness. Averment that although it takes every precaution to protect the health of its employees, it cannot be and is not by law required to be the guarantor of the good health of its employees; and that any employee who finds that his health is jeopardized by the working conditions required by it always has the option of seeking employment elsewhere. Denial of remaining allegations of complaint.

For a fourth defense: Contributory negligence or willfulness on the part of the plaintiff Williams in accepting employment and continuing to work after he knew or should have known that his physical condition would not permit him to work.

For a fifth defense: Assumption of risk by accepting employment and continuing to work after having been advised of his physical condition.

The defendant having moved, on November 20, 1958, to require the plaintiffs to elect whether their action sounded in contract or in tort, counsel for the plaintiffs stated that the action was one for tort.

On November 21, 1958, the defendant gave notice that upon the call of the case for trial it would call up its first and second defenses, namely, that the complaint failed to state a cause of action, and that the plaintiffs' remedy, if any, was under the Workmen's Compensation Act. On the opening day of the term these defenses were overruled; and the case was tried before the Honorable James Hugh McFaddin, Presiding Judge, and a jury, on December 1, 2 and 3, 1958. At the close of the testimony on the part of the plaintiffs their counsel withdrew their claim for punitive damages. Defendant's timely motions for nonsuit and for direction of verdict were overruled, and the case was submitted to the jury, which returned a verdict for the plaintiffs in the amount of $40,000.00 actual damages. Defendant thereafter moved for judgment *n. o. v.* or, in the alternative,

for a new trial. By order dated January 24, 1959, these motions were denied. This appeal followed.

Appellant's exceptions raise the following questions:

1. Has a cause of action at common law been stated or proven here?

2. If such a cause of action does exist, does the record here show contributory negligence or assumption of risk as a matter of law?

3. Is a cause of action for damages for personal injuries assignable so as to make the assignee a real party in interest?

4. If such a claim is assignable generally, should the court approve an assignment of a fractional interest in such claim made without consideration and for the sole purpose of preventing removal in a diversity case?

5. Is the claim here within the exclusive jurisdiction of the South Carolina Industrial Commission?

6. Did the presiding judge err in his charge to the jury?

7. Is the verdict so excessive as to indicate passion, caprice or prejudice?

The substance of Mr. Williams' testimony on direct examination follows:

He is thirty years old, married, and has three children. Upon his graduation from high school in 1947 he went to work for the South Carolina State Highway Department and remained in that employment approximately three years, leaving it to enter the military service. After about two years in the service he worked for South Carolina Electric & Gas Company for approximately two years, training to be a lineman. Thereafter, in August, 1953, he went to work for Du Pont. Every job that he ever held required manual labor. He had no physical trouble until December, 1956, when he "started having severe stomach pains and started hemorrhaging." He consulted Dr. Henry Gibson, of Barnwell, who sent him to the Barnwell Hospital for x-ray on January 10, 1957; and he remained there until January 19, 1957, when he returned to his home. The x-ray had revealed an ulcer.

Following a conference with Dr. Gibson, who had prescribed light work and a rigid diet that included drinking milk "about every hour" and the taking of medicine four times a day, he returned to work on January 28, 1957, reporting to DuPont's medical department in accordance with the company's rule. As to his interview with Dr. Poda, of that department, and subsequent events, Mr. Williams' testimony is quoted below:

"Q. Relate to us your conversation. A. I told him I had to go back to work, promised light work and could stay on my job. He said DuPont did not recognize ulcers in any others, I would have to take the breaks with the rest of the boys or be discharged.

Q. Following that routine he prescribed hard work for you? A. He said it wouldn't be.

Q. He told you it was all right for you to do that? A. Yes, sir.

\* \* \*

Q. What did you tell Dr. Poda when he told you to take the regular breaks? A. I told him I would have to have light work if I got back. He said I have to do the regular work.

Q. Did he give you any kind of notice, or paper? A. Yes, sir, gave me a little slip.

Q. Anything on it? A. Check regular work.

Q. What did you do when you got that? A. I gave it to my foreman John Rutland.

Q. Did you go back to light work? A. To my regular work.

Q. Was this work you were assigned was it light or extremely strenuous? A. Extremely strenuous and heavy.

Q. Did you protest to your foreman? A. I did.

Q. What were you told? A. Told me the slip was checked regular work, nothing he could do about it.

Q. Did you try to take any break to follow your feedings? A. Yes, sir. I was informed I would have to take a break along with the rest.

Q. Who told you this? A. Mr. Rutland.

Q. What did he say? A. Told me I would have to take a break with the rest of the boys, he would give no extra breaks.

Q. You were not following the schedule prescribed by Dr. Gibson? A. No, sir.

Q. Why? A. Because I was relying on the DuPont medical department. They were more familiar with it than Dr. Gibson.

\* \* \*

Q. How did you get along with the work, say until the first of April? A. Pretty good, until about the middle of April.

Q. Were you altogether free of pain? A. No, sir, never was.

Q. You got along reasonably well? A. Yes, sir.

Q. What happened to you the middle of April? A. Severe pains again.

Q. Did you get in touch with your foreman? A. He sent me to the medical department.

Q. Who did you see? A. Dr. Poda. I told him I was having trouble again. He told me I must have a family problem as the ruling that I must do my regular work wouldn't hurt me.

Q. Did you or not get any satisfaction from Dr. Poda? A. No, sir, I talked with Mr. Miller, the plant manager.

Q. Was anybody present when you talked to him? A. Yes, sir, T. D. Creighton, III, and another gentleman.

Q. Tell us the substance of the conversation you had with the plant manager. A. I told him I had been out sick in January with an ulcer. I was promised I would have light work, allowed to follow my feeding and that I hadn't been allowed to follow my feedings. He said that was definitely wrong; for me to go back and sit tight and he would do something about it. I went back. In a few days I started hemorrhaging again and went to the hospital.

Q. A day or so after you hemorrhaged again? A. Yes, sir.

Q. What time was that? A. Around May first.

Q. Did you go straight to the hospital? A. I went home, stayed there until May 12th, wasn't getting any better. I was under Dr. Gibson's care then.

Q. Until the 12th of May? A. The 12th of May.

Q. How long did you stay there this time? A. Until May 22nd.

Q. You came home? A. Yes, sir.

Q. What routine was prescribed for you? A. Rigid diet, lot of rest, regular hours.

Q. While in the hospital did your foreman or anybody connected with DuPont come to see you? A. Yes, sir, I was visited by my foreman. He told me when I was able to come back to work to report on shift work.

Q. Tell us what is shift work? A. A week four to twelve and a week twelve to four.

Q. You got out of the hospital and came home, got home the 22nd of May? A. Stayed home until June 20th.

Q. Did you go back to work? A. I did.

Q. When you reported back to work who did you report to? A. Medical Department, Dr. Whitaker.

Q. Why did you go back to the medical department? A. Any time you are out for sickness or injury you have to report to the medical department before you go to work.

Q. Tell us the conversation with Dr. Whitaker. A. I told Dr. Whitaker that Dr. Gibson prescribed light work, diet and light hours, he said the shift was not hard and go on and do it or be discharged.

Q. After talking with Dr. Whitaker was it contrary to what Dr. Gibson prescribed? A. Yes, sir.

Q. What did you do then? A. I went to work.

Q. Why? A. I was still relying on their medical department and hoping Mr. Miller would do something. I had a family to take care of. I had to work.

Q. You went back to your job? A. Yes, sir.

Q. Was the work assigned to you light and easy or heavy and strenuous? A. Heavy and strenuous.

Q. How did you get along then? A. Pretty good. Then I began to feel bad and I took a week of vacation, came back and still was not getting any better.

Q. You began to feel bad and took a week of vacation and went back? A. Yes, sir.

Q. How did you get along? A. I went to Dr. Gibson and he referred me to Dr. Holmes in Columbia.

Q. What else did you do? A. He put me in the hospital. That was around August 12, 1957.

Q. How long did you stay there? A. Until August 22nd, ten days. Came home and went in the Barnwell Hospital two days. I left there and went home, went back to the plant and resigned.

Q. What happened to your condition of health between September 1957 when you resigned until September 1958? A. I got along pretty bad.

Q. Did you report to Dr. Gibson you were getting along bad? A. No, sir.

* * *

Q. You were in the Columbia hospital in August, 1957. The hospitals you were in in January 1957 and May 1957, where were they? A. Barnwell.

Q. Whose general care were you under? A. Dr. W. H. Gibson.

Q. You got along very nice from late 1957 until September 1958? A. Yes, sir.

Q. What happened to you in September, 1958? A. I had already started hemorrhaging in September. In October, 1958 they took out seventy-five per cent of my stomach.

Q. Have you done any work since your operation in October? A. No, sir.

Q. What work did you do between August 1957 and September or October 1958? A. Little odd jobs.

Q. Between August 1957 and September 1958 when you were operated on whose care were you under, between the time you came home from the Columbia hospital? A. Dr. Gibson.

Q. During that period of time did you follow his instructions? A. I did. Rigid diet and regular rest.

Q. Did you do heavy work? A. No, sir."

Under cross examination, Mr. Williams testified:

For approximately three years following his graduation from high school he worked as inspector in the engineering department of the South Carolina State Highway Department; then he entered the military service; after completion of that service he entered the employ of DuPont as a rodman on construction work and was so employed from February, 1951, to January, 1952. He left DuPont in January, 1952, to enter the employ of South Carolina Electric & Gas Co. as a lineman apprentice, and worked as such until August, 1953, when he again went to work for DuPont, this time as a power laborer and operator, Classification C, and at a salary higher than he had been making with South Carolina Electric & Gas Co. After remaining in that classification for awhile, he was promoted to Classification B; and he held that classification until the fall of 1955, when he was at his own request transferred back to Classification C, still in the power department, so that he could "get off shift work." At that time he was not feeling well, and he had been told earlier in that year by Dr. Campbell, who was associated with Dr. Gibson, that he possibly had an ulcer, but that it wouldn't cause him much trouble. Dr. Campbell did not have an x-ray made.

In May, 1956, the company having decided to reduce the force in the power department, Mr. Williams, rather than terminate his employment, applied for transfer to the reactor department, and was so transferred, still retaining his C Classification. In the latter part of November, 1956, he started having serious stomach trouble; and in January, 1957, he went into the Barnwell County Hospital, where

diagnosis revealed an active ulcer. Dr. Gibson, his personal physician, was in charge of his case and has been his physician, in touch with him and advising him, ever since.

On January 28, 1957, he reported to Dr. Poda, who said that he would send him back to regular work and told him to get in touch with him if he should have any problems. From January 28 to April he was never free of pain. He was on day work, his working hours being from 8:00 a. m. to 4:00 p. m. A lunchroom was available, with a refrigerator in which he could keep his food; and there were two "breaks", one in the morning and one in the afternoon, during which he had the opportunity of going to the lunchroom. There were other occasional, but not regular, breaks. His foreman told him that he would have to take his breaks with the other men and could not have extra ones.

With reference to his having complained to Mr. Miller, the plant superintendent (in the latter part of April, 1957), Mr. Williams testified on cross examination that he had gone along with one Creighton, a fellow-employee, who wished to register a complaint with Mr. Miller and had asked Williams to accompany him; that they went first to Mr. Endorf, Superintendent of the Reactor Department, and:

"Q. You said you had a complaint? A. Yes, sir.

Q. What did he say? A. He said he wanted to hear it, he said I had more grounds of a grievance than anybody he heard.

\* \* \*

Q. You went on to Mr. Miller? A. Yes, sir.

Q. You went with Creighton to Mr. Miller who was the plant superintendent? A. Yes, sir.

Q. In the course of Creighton's complaint you said you also had a complaint and told him what it was? A. Yes, sir.

Q. That is the first Miller heard of it? A. As far as I know.

Q. He made notes on it? A. Yes, sir. I don't know what he was writing.

Q. You and Creighton and Miller were present? A. Another gentleman there. I don't know who he was.

Q. Did Miller say he would investigate your complaint? A. Yes, sir.

Q. What else did he tell you? A. To go back and sit tight and he would see something was done about it.

Q. Shortly after that you took another job and went back in the hospital in May? A. Yes, sir.

Q. You were out about six weeks? A. Yes, sir.

Q. During that time you were notified by Mr. Rutland you would be moved over to separations? A. Yes, sir.

Q. He told you you would be on shift work? A. Yes, sir.

Q. When you came back you knew you were going to be put on shift work? A. Yes, sir.

Q. You felt it wouldn't hurt your condition? A. I didn't know. I talked to the plant doctor and he assured me; I was living in hopes that Mr. Miller would do something about it.

Q. When you first went back to work you immediately asked for a transfer from separations area? A. To get off the shift work.

Q. Knowing you were going on shift work you worked on it anyway? A. Yes, sir.

Q. Doctor Gibson knew it? A. Yes, sir.

Q. Did he advise you any? A. He said it wouldn't help me.

Q. You decided to go anyway? A. Yes, sir."

Further, that he continued on shift work in the separations area for about a month, i. e., until July 22, when he took a weeks' vacation, after which he went into the reactor department, his foreman being a Mr. Ely. Williams testified that he considered his duties there hard. Asked if he talked to Mr. Ely about his condition, he replied: "Yes, sir. Mr. Ely was very nice to me, but I was already sick".

And further:

"Q. You aren't complaining about what happened from there on? A. Yes, sir.

Q. What did Mr. Ely do he should not have done because it was wrong to you? A. I don't know anything he did wrong.

Q. That was daytime work? A. Yes, sir.

Q. In August the thing flared up again? A. It was already flared before August.

Q. You went to Columbia in the hospital there and went through a series of tests there? A. Yes, sir.

Q. Under Dr. Holmes? A. Yes, sir.

Q. Is he an internal medicine man? A. Yes, sir.

Q. You came back home and spent two days in the Barnwell Hospital? A. Yes, sir.

Q. What was the purpose of that? A. I didn't feel good, I felt real bad and weak. I went in the Barnwell Hospital a few days.

Q. You went back on the job? A. I don't remember whether I worked a few days or not. I went back out and resigned.

Q. If your work record shows eight hours daytime ninth to fifteenth of September, then terminated on the 16th, is that about right? A. Yes, sir.

Q. DuPont didn't fire you? A. No, sir.

Q. It was entirely voluntary on your part? A. I left because Doctor Holmes said if I wanted to live to quit.

Q. Back in May Doctor Gibson told you the work wouldn't help you? A. He said it wouldn't be good for me.

\* \* \*

Q. Were you on a milk diet during the entire year of 1957 while with DuPont? A. No, sir, not the entire year.

Q. Part of it? A. Yes, sir.

Q. One time you've been vomiting milk? A. Yes, sir.

Q. Had you been able to drink your milk at that time? A. Yes, sir, I had a lunch period. I drank milk in the morning break.

Q. And the afternoon break? A. Yes, sir.

Q. Three times during the eight hour period you had a chance to get milk? A. Yes, sir, I could drink milk three times a day.

Q. You stated you were relying on DuPont medical in these matters. You were also under the care of Doctor Gibson the whole time and relying on him? A. Everywhere, yes, sir."

And on re-direct:

"Q. The medical department you testified about, who was that maintained by? A. DuPont.

Q. The doctors did they work regularly? A. Regularly.

Q. By whom were they employed? A. DuPont.

Q. Why did you go back to the medical department? A. Before I went to work, because you have to go through the medical department or they won't accept you.

Q. Were they going to treat you or help you? A. No. Definitely not.

Q. Do they treat people there who have been out sick? A. No, sir.

Q. What were they going to do for you at the medical department, for your benefit? A. I don't know.

Q. Do you know of anything? A. No, sir.

Q. What was the purpose of you going there? A. DuPont rule I had to go to them.

Q. The company required you to go there before you went back to work? A. Yes, sir.

Q. Do you know of any benefit you would get from them? A. No, sir."

The substance of Dr. Gibson's testimony is as follows:

Williams came to his office during the first week in January, 1957, complaining of stomach pains that he had been suffering since November, 1956. Dr. Gibson's diagnosis of peptic ulcer was confirmed by report of x-ray examination January 10, 1957, which showed active duodenal ulcer. Before Williams went back to work, which was on January

28, 1957, some doctor with the DuPont medical department telephoned Dr. Gibson, inquired as to how Williams was getting along and when he would likely be able to return to work. Dr. Gibson replied that Williams was "doing fine"; and it would be some time before the ulcer would be completely healed; that if they gave him light work, with no manual labor, allowable time to stay on his diet, and rest with regular hours, he would be glad to return him to work; and to this the doctor replied that they would be able to do that. Thereupon Dr. Gibson advised Williams that he could return to work on January 28th. He saw Williams with some regularity until the first of May. Further $x$-rays were made about February 21st, which showed marked improvement in the appearance of the duodenal ulcer. In mid-April Williams told him that he had not been able to follow his advice, and that he had not been able to be on light work and take his medicine as he should; and that he was having trouble with his stomach again. Williams was readmitted to the Barnwell Hospital on May 12, at which time $x$-ray examination revealed an active duodenal ulcer; and he remained there until May 22. Dr. Gibson returned him to work on June 26, 1957. Prior to that, Dr. Gibson talked with Dr. Whitaker of the DuPont medical department, who informed him that if Williams returned to work he would have to return to regular work and to shift work. Dr. Gibson then stated that in his opinion it would be very injurious for any ulcer patient to return to that work; to which Dr. Whitaker replied that under the policy of the DuPont medical department Williams would, if he returned, have to return to regular work and shift work. Despite this, Dr. Gibson returned Williams to work on June 26, prescribing that he should remain on a rigid diet, take his medication, and "get as much regular rest and work regular hours, if at all possible." Williams remained under Dr. Gibson's care, and although he complained of "some minor trouble" it was not until around the first part of August that "he began to really complain". At that time Dr. Gibson advised him that he would like to get another opinion on his case, and referred

him to Dr. Holmes, of Columbia, a specialist in internal medicine. After remaining in the hospital in Columbia from August 12 to August 22, 1957, during which time $x$-ray examinations were made, Williams was returned to Dr. Gibson to be admitted to the Barnwell County hospital, where he remained until August 24. He returned to work about September 10 and shortly thereafter resigned. Dr. Gibson continued to contact him at regular intervals and was told by Williams that he was getting along fairly well, until September, 1958, when he informed Dr. Gibson that he had been having some difficulty continuously since he was last in the hospital. Dr. Gibson again had him $x$-rayed, and concluded that he had a bleeding duodenal ulcer; whereupon he recommended surgery and sent him to Dr. Mace, of Barnwell, who concurred in the thought that surgery was indicated; and on October 6 Dr. Mace removed 75 per cent of his stomach. Dr. Gibson was of the opinion that had Williams continued on the regime that Dr. Gibson had set up for him in January, 1957, his ulcer would have healed; and that its failure to heal was caused by his not staying on the prescribed diet, not taking medication as prescribed, doing heavy manual labor, and not getting regular rest.

Under cross examination, Dr. Gibson testified that when he returned Williams to work in January, 1957, he expected him to stay on light work for months, until his ulcer should have healed. Also that, understanding from his conversation with Dr. Whitaker in May, 1957, that if Williams went back to DuPont he would be on shift work, he had told Williams that such work would be injurious to his condition; to which Williams had replied that he had to return to work and wanted to go back, and that he hoped to get off shift work.

Dr. Mace, who first saw Williams as a patient in March, 1958, testified that from the history of the case as given to him by Mr. Williams, he was of the opinion that the recurrence of the ulcer after Williams' hospitalization in January, 1957, was the result of his not staying on his diet, not taking his medicines, doing strenuous manual work, and not getting the proper amount of rest.

The other witnesses for the respondents were: (1) Williams' fellow-employee Creighton, who corroborated Williams' account of his interview with Miller; and (2) Williams' father, who testified that Williams' assignee Carter was his brother-in-law and lived in New Castle, Delaware.

Withdrawal of the claim for punitive damages was proper; the evidence was not reasonably susceptible of the inference of willfulness on appellant's part. It is also clear from respondents' testimony, and they so concede in their brief, that Williams' employment did not cause his ulcer; that when he returned to work in January, 1957, after his physician had discovered the ulcer, he continued to do the same work that he had been doing previously; and that thereafter throughout his employment he continued to perform only the regular and usual duties of his job. Their position, briefly stated, is that his ulcer did not heal because the performance of the usual duties of his employment prevented his following the diet, doing the "light work", and taking the amount of rest, that his physician had prescribed; and that his resulting disability was due to appellant's negligence: (1) in not fulfilling the assurance, given to his physician by an unidentified member of its medical department in January, 1957, upon which Williams relied, that upon his return he would be given light work, would be required to do no manual labor, and would be allowed time to "stay on his diet and rest with regular hours"; (2) in requiring him, through its medical department, to perform the usual duties of his employment, despite its knowledge that his personal physician had prescribed light work, a rigid diet and plenty of rest; (3) in assuring him, through its medical department, that his regular work would not hurt him; and (4) in not fulfilling the assurance, given to him by its plant manager in April, 1957, and upon which he relied, that his complaint would be investigated and something would be done about it.

The first of these charges of negligence must fall, for two reasons: first, because there is no evidence that the person who is alleged to have given such assurance had authority

to do so; and, second, because if any such assurance had been given it was negatived by the physician of appellant's medical department, Dr. Poda, to whom Williams reported before returning to work, and who at that time, according to Williams' own testimony, told him that he would be required to do his regular work.

Much of the able briefs on both sides is devoted to discussion of whether appellant is chargeable with negligence based upon the ruling of its medical department that Williams should perform his regular duties, and upon the assurance by that department that to do so would not hurt him. Appellant's counsel point to the familiar exception to the rule of *respondeat superior,* whereby an employer is not chargeable at common law with the negligence of a physician selected by him to attend an employee, unless it be shown that he failed to exercise due care in such selection. 35 Am. Jur., Master and Servant, Section 111; 56 C. J. S., Master and Servant, § 165; *Crawford v. Davis,* 136 S. C. 95, 134 S. E. 247. On the other hand, counsel for respondents, admitting that there is no evidence here of negligence on the part of appellant in the selection of its physicians, cite cases in other jurisdictions to the effect that the exception would not be applicable here because: (1) the physicians of appellant's medical department were regular employees provided by appellant for its own benefit as well as for that of Williams and other employees; and (2) their relationship to Williams was not that of physician to patient, in that he was not under treatment by them, their only function so far as he was concerned being to determine whether or not he was physically fit for the duties of his employment. As we view the record here, decision of that issue is not necessary, nor need we determine whether or not negligence on the part of the appellant might have been inferred from the statement, before mentioned, alleged to have been made by its plant manager on the occasion of his interview with Williams and Creighton. For, assuming that the testimony warranted submission to the jury of the issue of negligence, we are convinced, after

careful study of it, that it was susceptible of no reasonable inference other than that the respondent Williams was guilty of contributory negligence barring his recovery.

If it be conceded that Williams' disability is traceable to his continuance in appellant's employ after the appearance of his ulcer in January, 1957, it is manifest from his own testimony that such disability resulted from no unusual work situation, nor from the normal routine of his employment, but from the hazard of performing his usual work in his diseased condition. That hazard was created by him; the risk of its aggravating his disease was known to him; his own physician had advised him of it. The suggestion that appellant compelled him to work is without force; he was at liberty to resign at any time. The necessity of earning a livelihood may drive one to keep on working although he knows that to do so is beyond his proper physical limitations, but it is not a compulsion by the employer or one for the consequences of which, in a case such as this, the employer may be held liable in damages.

This is not a case in which an employee, protesting against the danger, because of his physical condition, of performing a particular task assigned to him, has the right to rely upon his employer's assurance that he may safely perform that task. The right to rely upon such assurance is predicated upon the assumption of superior knowledge on the employer's part. No such superiority of knowledge can be reasonably inferred from the evidence here. Mr. Williams was better informed of the hazard to his health than were appellant's physicians, who, as he testified, had not attended him and were not going to treat or help him, and from whom he expected no benefit. Nor are we here concerned with an ignorant, inexperienced or immature employee. The evidence discloses Mr. Williams as an intelligent, mature man, experienced in his job and cognizant of its requirements. With full knowledge that performance of his regular duties would probably endanger his health by aggravating the disease from which he was suffering, he chose, for personal rea-

sons, and against his physician's advice, to continue on his job. If it can be said that his employer was negligent in requiring him to perform the usual duties of his employment, and in not assigning him to some other and less strenuous work, the record here compels the conclusion, in our opinion, that his own voluntary action was the proximate contributing cause of the hazard to his health thus created, and of the disability of which he now complains. Since this conclusion requires reversal of the judgment and remand of the cause for entry of judgment in favor of appellant under Rule 27, determination of the other issues raised by the exceptions becomes unnecessary, and we intimate no opinion thereabout.

Reversed and remanded for entry of judgment in favor of appellant under Rule 27.

STUKES, C. J., and TAYLOR, OXNER and MOSS, JJ., concur.